SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE
OFFICIAL REPORTERS

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **L.C.H., a Minor,**<br>**By and through his Father and Next**<br>**Friend, LARRY HAGAN,**<br><br>          Plaintiff,<br><br>and<br><br>**LARRY HAGAN, Individually**,<br><br>          Plaintiff,<br><br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>          Defendant. | Civil Action No. 12-cv-916 (RLW) |

## **MEMORANDUM OPINION**[1]

Plaintiffs Larry Hagan and his minor son L.C.H. bring this action for medical malpractice under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80 ("FTCA"). They claim that inadequate care L.C.H. received shortly after his birth led to hypoxic ischemic encephalopathy, which results from lack of oxygen to the brain. Defendant moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). (Dkt. No. 10). Because Plaintiffs filed

---

[1]   This unpublished memorandum opinion is intended solely to inform the parties and any reviewing court of the basis for the instant ruling, or alternatively, to assist in any potential future analysis of the *res judicata*, law of the case, or preclusive effect of the ruling. The Court has designated this opinion as "not intended for publication," but this Court cannot prevent or prohibit the publication of this opinion in the various and sundry electronic and legal databases (as it is a public document), and this Court cannot prevent or prohibit the citation of this opinion by counsel. Cf. Fed. R. App. P. 32.1. Nonetheless, as stated in the operational handbook adopted by our Court of Appeals, "counsel are reminded that the Court's decision to issue an unpublished disposition means that the Court sees no precedential value in that disposition." D.C. Circuit Handbook of Practice and Internal Procedures 43 (2011).

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE
OFFICIAL REPORTERS

their complaint more than two years after their claim accrued, under the FTCA this Court does not have subject matter jurisdiction. Accordingly, Plaintiffs' complaint must be dismissed.

## I. FACTUAL SUMMARY

The claims in this case arise from the treatment of L.C.H. shortly after his birth around April 2007. L.C.H. was about six months gestational age when he was born at the National Naval Medical Center ("NNMC"). (Dkt. No. 1 at ¶ 16). He weighed less than two pounds. He remained in the hospital for about 10 weeks after his birth, in part because he had "developed bilious stomach residual contents and had dilated loops of bowel." (Id. ¶ 19). While at home around August 15, 2007, L.C.H. experienced symptoms including "forceful emesis, numerous episodes of vomiting, distressful crying, and reported refusal of food," and L.C.H.'s father Larry Hagan ("Hagan") took him to Walter Reed Army Medical Center. (Id. ¶ 23). Doctors took several actions to determine what was wrong with L.C.H., and noted certain abnormalities. However they canceled a planned test and noted at L.C.H.'s discharge that "bowel obstruction, volvulus and intermittent bowel obstruction ha[ve] been ruled out." (Id. ¶¶ 32-38). L.C.H. had multiple follow-up visits over the next weeks at NNMC. During this time, he was diagnosed with infantile colic, and doctors also noted abdominal tenderness. (Id. ¶¶ 42-55).

During a chaotic few days in September 2007, L.C.H. had a stroke that led to his current condition. On a visit to DeWitt Army Community Hospital, doctors told Hagan to take L.C.H. to the emergency department at NNMC. (Id. ¶ 56). A doctor at NNMC reported a concern of a bowel obstruction. (Id. ¶ 64). L.C.H. was taken by helicopter to Walter Reed for surgical evaluation. (Id. ¶ 66). After evaluation that Hagan contends was unacceptably long given the situation, L.C.H. was transferred to Children's National Medical Center. Hagan claims that the method of transfer to Children's was inadequate. (See id. ¶¶ 89-91). During the transfer L.C.H.

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

experienced decreased oxygen saturation, and "[i]t was likely during this period of low oxygen saturation and low blood pressure that L.C.H. experienced a hypoxic ischemic insult, i.e. a stroke." (Dkt. No. 10, at 3 (footnote omitted); see also Dkt. No. 1 at ¶ 86). Hagan was told of the stroke in September 2007. (Dkt. No. 14, at 8). Doctors performed surgery at Children's, "where a bowel obstruction was identified and a large portion of necrotic small bowel was removed." (Dkt. No. 1 at ¶ 92). A second surgery two days later removed additional small bowel. (Id. ¶¶ 95-99). Two days after that, September 11, 2007, L.C.H. suffered a seizure. (Dkt. No. 18, at A10).[2] Tests that day revealed "bilateral-parietal occipital infarcts as well as bilateral temporal lobes infarcts"; an infarct is a "localized area of tissue death caused by an interruption in the blood supply to the area." (Id. at 3-4 and n.3). Defendant terms the test results as "reveal[ing] significant areas of brain tissue death." (Dkt. No. 15, at 11).

What is critical here are the neurologic consequences from these events, and when Hagan learned of them. According to the Complaint, "[p]hysicians at NNMC and/or Walter Reed advised Mr. Hagan that L.C.H. had not suffered any neurologic consequences from the events of September 2007. Despite this assurance from Defendant, L.C.H. had suffered a hypoxic ischemic insult. It remained undiagnosed until March of 2009." (Dkt. No. 1 at ¶¶ 101-02). But, according to a doctor who spoke with L.C.H.'s parents on September 12, 2007, as of that date they "understand the severity of [L.C.H.'s] neurological and intestinal injuries." (Dkt. No. 18, at A13; see also Dkt. No. 14, at 8). A "Consultation Request and Report" from Children's dated September 26, 2007 noted "head shows stable, right parietal encephalomalacia. CT head (9/11) edema to bilateral and temporal-parietal lobes and hypodensity c/w watershed infarcts." (Dkt. No. 18, at A15). Encephalomalacia is a sign of brain injury. (See Dkt. No. 1 at ¶ 106). Hagan

---

[2]  Plaintiffs make no mention of L.C.H.'s seizure in their Complaint or Opposition to Defendant's Motion to Dismiss.

states "there is no evidence before this Court that Larry Hagan was aware of the content of the September 26, 2007 consultation report let alone any indicia that if in fact he had seen the report that he would have understood that it signified permanent injury for L.C.H." (Dkt. No. 14, at 16-17).

In October 2007, Hagan and his then-wife[3] "expressed concern about neuro C/S and the need to repeat CT and MRI scans due to the stroke L.C.H. had in the PICU." (Dkt. No. 18 at A18). A December 2007 record from a visit for "screening mental/developmental disorders" noted "delayed milestones." (Dkt. No. 14 at A5). A record dated January 2008 from NNMC noted an abnormality of appearance of L.C.H.'s head and delayed milestones, and referenced a need to contact the county's Early Intervention services. (Id. at A10-11). In February 2008 L.C.H. had his first appointment in the High Risk Clinic at NNMC because "he was a high risk infant for developmental delays." (Dkt. No. 18 at A21). A record from February 2008 stated the reason for L.C.H.'s visit was "delayed developmental milestones gross motor" and recommends a follow up in the High Risk Clinic at NNMC. (Dkt. No. 14 at A14). It also recommended a weekly physical therapy/occupational therapy session. (Id. at A17). An April 2008 record noted "delayed developmental milestones gross motor." (Id. at A20). Around July 25, 2008 L.C.H. "was noted to not progress at the same rate as a typical child and not as fast as expected." (Id. at A22).[4] A February 20, 2009 MRI revealed "extensive areas of gliosis and encephalomalacia."

---

[3]   On December 10, 2012, L.C.H.'s mother, Dana Wilson, filed a motion to intervene and asked this Court to appoint a guardian ad litem to replace Hagan as L.C.H.'s representative/next friend. (Dkt. No. 20). Nothing in that motion changes the analysis here, it provides no additional information relevant to the analysis under Rule 12(b)(1), and there is no request to delay action on the motion to dismiss. Therefore Ms. Wilson's motion will be denied as moot.

[4]   Although Plaintiffs do not concede that the clock on the statute of limitations began here, they do note that their "administrative claim was submitted to the appropriate agencies on July 23, 2010, which was within two years of this initial finding by Dr. Andersen." (Dkt. No. 14 at 10 n.5).

(Dkt. No. 1 at ¶ 105). Hagan claims he "did not know of this finding nor understand its impact on L.C.H. until 2010." (Dkt. No. 14, at 13). According to the administrative claims filed by Hagan and L.C.H., when L.C.H. was diagnosed with hypoxic ischemic encephalopathy around March 2009, "imaging studies in 2009 did not reveal any new lesions when compared with the brain imaging studies performed in September 2007." (Dkt. No. 18 at A31, A38).

Plaintiffs filed a written claim with the government around July 23, 2010 (id. at A23), and filed their Complaint with this Court on June 6, 2012. (Dkt. No. 1). Plaintiffs' Complaint contains two counts: Count I is titled "Medical Malpractice—Negligence," while Count II is for Hagan's "services and expenses" for L.C.H. Plaintiffs are seeking $50,000,000 in damages.

## II.  DEFENDANT'S MOTION TO DISMISS

### A.  Rule 12(b)(1) Standard

Federal courts can only hear claims over which they have subject matter jurisdiction. Al-Zahrani v. Rodriguez, 669 F.3d 315, 317-18 (D.C. Cir. 2012). Because standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), finding that a plaintiff has standing is a necessary "predicate to any exercise of [the Court's] jurisdiction." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc). The party seeking to invoke the court's jurisdiction bears the burden of establishing subject matter jurisdiction. U.S. Ecology, Inc. v. Dep't of the Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). Under Rule 12(b)(1), the Court may dispose of the motion on the basis of the complaint alone, or it may consider materials beyond the pleadings "as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citations omitted).

### B. Federal Torts Claims Act

This case is brought under the FTCA. The FTCA provides for a limited waiver of the United States' sovereign immunity for certain torts of federal employees that are committed within the scope of their employment. Under the FTCA, a plaintiff must first file an administrative complaint with the appropriate federal agency before filing suit in district court. See 28 U.S.C. §§ 2675(a), 2679(d)(5). In addition, any claim under the FTCA "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six month after the date of mailing . . . of notice of final decision of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).

The government has moved to dismiss this case under Rule 12(b)(1) for lack of subject matter jurisdiction. Plaintiffs, relying on, inter alia, Smith v. United States, 518 F. Supp. 2d 139, 147 (D.D.C. 2007), state that the FTCA's statute of limitations defense is not jurisdictional, and therefore the government should have brought their motion under Rule 12(b)(6). (Dkt. No. 14, at 3). ("[A] statute of limitations defense . . . is not jurisdictional in nature.") (citing Day v. McDonough, 547 U.S. 198, 205 (2006)). Plaintiffs' argument stems in part from a desire to "assert[ ] statutes of limitations defenses—including equitable tolling." (Dkt. No. 14, at 4). If 28 U.S.C. § 2401(b) is jurisdictional, equitable tolling would likely be unavailable.

### III. ANALYSIS

### A. The FTCA Statute of Limitations Defense is Jurisdictional

Post-Smith, the Supreme Court's decision in John R. Sand & Gravel Co. v. United States, 552 U.S. 130 (2008) indicates that the statute of limitations defense under the FTCA is jurisdictional. In John R. Sand, the Supreme Court stated that 28 U.S.C. § 2501, which provides

that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues," is a "jurisdictional," "more absolute, kind of limitations period." Id. at 134.  The issue of how this applies to the FTCA has not been resolved by the D.C. Circuit and has split other Circuits, although most seem to think it is jurisdictional.  See Bazzo v. United States, No. 11-1914, 2012 WL 3326308, at *1 (6th Cir. Aug. 15, 2012) (referring to "an emerging trend disfavoring application of equitable tolling in the context of § 2401(b)" and citing cases).[5]

This Court finds that the FTCA's statute of limitations is a jurisdictional bar to a claim, and that the government properly brings its motion to dismiss under Rule 12(b)(1).  The language found jurisdictional in John R. Sand, "shall be barred," is the same language used in 28 U.S.C. § 2401(a).  But the language at issue here is even stronger:  a tort claim not brought after two years "shall be forever barred."  See 28 U.S.C. § 2401(b).  If the language in 28 U.S.C. § 2501 caused the Supreme Court to deem that statute jurisdictional, it is even more likely that the language at issue here would result in the same conclusion from that Court.  The language of the statute itself, combined with recent Supreme Court and Circuit Court precedent, indicates that the FTCA's statute of limitations should be considered a jurisdictional bar to a claim.

**B. Plaintiffs' Claims are Barred Under the FTCA's Statute of Limitations**

The seminal case on the FTCA's statute of limitations remains United States v. Kubrick, 444 U.S. 111 (1979).  A claim accrues under the FTCA "by the time a plaintiff has discovered both his injury and its cause, even though he is unaware that the harm was negligently inflicted."

---

[5]   Smith relied in part on P&V Enterprises v. U.S. Army Corps of Engineers, 466 F. Supp. 2d 134 (D.D.C. 2006), which was affirmed by the D.C. Circuit on alternate grounds when they dismissed for lack of subject matter jurisdiction instead of failure to state a claim.  See P&V Enterprises v. U.S. Army Corps of Engineers, 516 F.3d 1021, 1026 (D.C. Cir. 2008).  In that case, the Circuit stated "the court has no occasion to address potential implications of" John R. Sand.  Id. at 1027 and n.2.

Sexton v. United States, 832 F.2d 629, 633 (D.C. Cir. 1987) (quoting Kubrick, 444 U.S. at 120, 123) (quotations omitted). In Kubrick, doctors used neomycin to treat the plaintiff for an infection, and six weeks later he noticed problems with his ears. Eight months after his initial discharge, Kubrick was told by a doctor who secured his VA records that "it was highly possible that the hearing loss was the result of the neomycin treatment administered at the hospital." Kubrick, 444 U.S. at 114. Because Kubrick filed suit more than two years after being told of the "highly possible" reason for his hearing loss, the Supreme Court found in favor of the government on statute of limitations grounds. The Court held:

> "A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute. . . . If he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury."

Id. at 123-24. Thus, a medical malpractice claim accrues under the FTCA when a plaintiff knows or should have known of the existence of an injury and its cause, even if the plaintiff is given certain inaccurate information.

Here, the "cause" of L.C.H.'s injury is not in dispute—it occurred during his medical care after birth and extending into September 2007—so what is in dispute here essentially boils down to what "injury" is at issue: L.C.H.'s hypoxic ischemic encephalopathy, or his stroke. If his injury is the former, this case can proceed because Hagan's claim was filed within the statute of limitations. If however his injury is the latter, this case should be dismissed because it was not filed within the statute of limitations.

Almost since the day of L.C.H.'s birth, he has been under medical supervision. Hagan knew his child had a stroke in September 2007. (Dkt. No. 14, at 8). Medical records indicate brain tissue death in September 2007. (See Dkt. No. 18 at A15). Medical records also indicate that Hagan and his wife were told of severe neurological injuries in September 2007. (Id. at A13). And medical records indicate concerns expressed by Hagan and his wife about L.C.H.'s neurological health. (Id. at A18). Hagan, who has the burden to establish jurisdiction, submitted an affidavit that neglected to offer any rebuttal to why these records and their findings should not start the accrual clock in September 2007. See, e.g., Evans-Hoke v. Paulson, 503 F. Supp. 2d 83, 85 (D.D.C. 2007) ("[P]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim because the plaintiff has the burden of proof to establish jurisdiction.") (internal quotations and citation omitted).

The constant medical attention because of the events around L.C.H.'s birth never ceased, and should have served as a warning signal. Records indicate frequent medical contact, with certain records noting recommendations for weekly visits. (See, e.g., Dkt. No. 14, at A17 ("recommendation for weekly PT/OT sessions")). Some of these visits were to high risk clinics, and they began more than two years before Hagan filed his administrative claim. Records from these visits note, among other things, delayed milestones. (See, e.g., id. at A10-11). At oral argument, counsel for Hagan referred to "a specific notation [in L.C.H.'s medical records] that there are no neurological sequelae," (Court Tr. at 29:8, Nov. 26, 2012) and then later said: "Again and again and again is the statement, there are no permanent neurological sequelae." (Id. at 31:10-11). But the medical records are not as clear as Plaintiffs represent. They state, for example, that on January 24, 2008 L.C.H. had "no apparent neurologic sequelae," (Dkt. No. 14

at A11), or that on February 21, 2008 he was "without significant neurologic sequelae." (Id. at A18). "Without significant neurologic sequelae" does not mean no neurologic sequelae.

This case is similar to T.L. ex rel. Ingram v. United States, a case that found a claim under the FTCA accrued when the parent was informed of a brain injury at birth and not later with the discovery of problems arising from the brain injury. 443 F.3d 956 (8th Cir. 2006). In Ingram, doctors informed a mother that her daughter had brain damage just after her birth. Only later did the mother learn that her daughter had cerebral palsy. The court found that "accrual of a claim based on brain injury at birth is not tolled merely because the injury worsens and develops into cerebral palsy. Ingram had a duty under law to seek advice about possible legal action at the time she knew of T.L.'s brain injury, not only after the full effects of the brain damage were manifested." Id. at 962-63. In Ingram, doctors noted development within normal limits, which Ingram argued meant her claim could not have accrued earlier. The court stated: "we cannot agree that conflicting or inaccurate diagnoses are sufficient to toll the statute of limitations, for it would be impractical to conclude that the limitations period stops and starts depending on the diagnosis of each doctor who examines a patient after the occurrence of an injury." Id. at 963.

L.C.H. did not sustain a separate "injury" that led to his hypoxic ischemic encephalopathy. The diagnosis of hypoxic ischemic encephalopathy occurred from brain imaging studies that "did not reveal any new lesions when compared with the brain imaging studies performed in September 2007." (Dkt. No. 18 at A31, A38). Cases from many courts lend support to the conclusion therefore that the injury occurred in September 2007. The "FTCA inquires as to injury—not as to diagnosis or full extent of injury. To be aware of an injury, a plaintiff need not know the full extent of his or her injury. The limitations period will run even though the ultimate damage is unknown or unpredictable." Bohrer v. City Hosp., Inc., 681 F.

Supp. 2d 657, 665 (N.D. W. Va. 2010) (quotations and citations omitted) (emphasis in original); see also Gonzalez v. United States, 284 F.3d 281, 290 (1st Cir. 2002) ("The plaintiff's repeated attempts to ask the doctors what was wrong with her baby further showed her awareness of not only the injuries but also their potential cause."). As in the present matter, in Bohrer the plaintiffs argued their claim did not accrue until they knew the full extent of damages with specificity. The court in Bohrer stated: "While at first glance such a claim seems compelling, the possible results of such a rule would run afoul of the very problems the FTCA statute of limitations seeks to prevent." 681 F. Supp. 2d at 666 (citation omitted); see also Hulver v. United States, 562 F.2d 1132, 1137 (8th Cir. 1977) ("It is also well-established that one who knows he has suffered from medical malpractice may not postpone an action until the full extent of his damage is ascertained.") (citations omitted); Ashley v. United States, 413 F.2d 490, 493 (9th Cir. 1969) ("To hold that one who knows that an injurious tort has been committed against him by the Government may delay the filing of his suit until the time, however long, when he becomes knowledgeable as to the precise extent of the damage resulting from the tort would impose intolerable burdens upon the Government and would, in effect, frustrate the expressed will of Congress.").

No cases cited by Plaintiffs are to the contrary. For example, Plaintiffs claim that Monday v. United States, 688 F. Supp. 788 (D. Me. 1988), held that a claim accrued only with the diagnosis of permanent injury. (See Dkt. No. 14, at 11-12; see also Court Tr. 25:2-12, Nov. 26, 2012). In Monday, the child did not have a neurologic exam until nearly one year after birth, and the court there held the record was incomplete and did not show, for example, "whether the Mondays asked about o[r] were informed of the risk of permanent injury." Id. at 791. In addition, the Monday court found the record did not show whether the parents were put on notice

about the possibility of permanent injuries. Id. Here the record indicates a fundamentally different situation. For example, a neurologic exam took place in September 2007, the parents were put on notice and made aware of serious concerns, and visits to a high risk clinic for L.C.H. began more than two years before Plaintiffs filed their administrative claim. In Green v. United States, 180 Fed. Appx. 310, 311 (3rd Cir. 2006), the court noted plaintiff "was never informed that there was any problem with his prosthesis," unlike here where medical records indicate conversations about neurological problems between doctors and L.C.H.'s parents in September 2007. And when quoting Kerstetter v. United States, 57 F.3d 362, 365-66 (4th Cir. 1995), Plaintiffs omit key sentences, including the statement that "[b]ecause the Kerstetters became aware of the two facts critical for purposes of claim-accrual—that Elizabeth had been injured, and that the surgery caused her injury—no later than July 1987, the district court correctly determined that the FTCA statute of limitations barred all of the Kerstetters' claims unless the statute was tolled."

### C. Summary

This case arises from a tragic set of facts. No parent should have to see their child suffer, let alone sustain permanent damage from a very young age. And no parent wants to question whether the doctors are providing appropriate medical treatment for his or her child. But "[s]tatutes of limitation oftentimes render harsh results," Webb v. United States, 535 F. Supp. 2d 54, 60 (D.D.C. 2008), and they require parties to "seek information outside the hospital, to evaluate the known facts, in order to find out whether the doctors [breached the standard of care]." Sexton, 832 F.2d at 636 (emphasis in original). L.C.H.'s diagnosis of hypoxic ischemic encephalopathy was from brain imaging studies that "did not reveal any new lesions when compared with the brain imaging studies performed in September 2007." (Dkt. No. 18 at A31,

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

A38). That is because L.C.H.'s injury occurred in September 2007. Since Hagan failed to take legal action within the two year time frame provided under the FTCA, this case must be dismissed.

## **CONCLUSION**

For the foregoing reasons, Defendant United States of America's motion to dismiss is **GRANTED**. An Order accompanies this Memorandum.


Date: December 14, 2012

ROBERT L. WILKINS
United States District Judge