UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LARRY HAGAN, *et al.*, <br>     Plaintiffs, <br>     v. <br> UNITED STATES OF AMERICA, <br>     Defendant. | Civil Action No. 12-916 (CKK) |
| DANA WILSON, <br>     Plaintiff, <br>     v. <br> UNITED STATES OF AMERICA, <br>     Defendant. | Civil Action No. 15-90 (CKK) |

**MEMORANDUM OPINION AND ORDER**
(August 15, 2017)

These consolidated cases emerge from alleged medical malpractice by agents of the United States with respect to Plaintiff L.C.H., a minor, which allegedly resulted in a severe brain injury. Plaintiffs Hagan and Wilson, the parents of L.C.H., seek damages under the Federal Tort Claims Act ("FTCA") stemming from the alleged malpractice. Pending before the Court are cross-motions for summary judgment on the government's statute of limitations defense. For the reasons detailed below, the Court concludes that summary judgment in favor of either party is unwarranted. A determination of when Plaintiffs became aware of L.C.H.'s brain injury requires a weighing of the evidence and the making of credibility determinations, neither of which are appropriate on a motion for summary judgment. Accordingly, upon consideration of the pleadings,[1] the relevant legal authorities,

---

[1] The Court's consideration has focused on the following documents: Pls.' Mot. for Partial Summ. J. With Respect to the Government's Seventh Defense of Statute of Limitations, ECF No. 50 ("Pls.' Mem."); Statement of Undisputed Materials Facts in Support of Pls.' Mot. for Partial Summ. J., ECF No. 50-1 ("Pls.' Stmt."); Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J., ECF No. 51 ("Def.'s Mem."); Def.'s Statement of Material

1

and the record as a whole, Plaintiffs' [50] Motion for Partial Summary Judgment is **DENIED**, and Defendant's [51] Motion for Summary Judgment is **DENIED**.[2]

## I. BACKGROUND

### A. Procedural History

This case was previously dismissed for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), based on the running of the FTCA's statute of limitations. *See L.C.H. ex rel. Hagan v. United States*, No. 12-CV-916 RLW, 2012 WL 6570685, at *6 (D.D.C. Dec. 14, 2012) (Wilkins, J.). That dismissal under Rule 12(b)(1) was vacated and remanded by the D.C. Circuit in light of the Supreme Court's decision in *United States v. Kwai Fun Wong*, 135 S. Ct. 1625 (2015), which held that the FTCA's statute of limitations is not jurisdictional. This Court subsequently denied Defendant's motion to dismiss pursuant to Rule 12(b)(6), and found that summary judgment on the government's statute of limitations defense was premature because discovery had yet to be taken. *See Hagan v. United States*, 197 F. Supp. 3d 30, 33 (D.D.C. 2016).

### B. Factual Background

L.C.H was born on April 3, 2007 at National Naval Medical Center ("NNMC") at a gestational age of under 25 weeks. Pls.' Stmt. ¶ 1. L.C.H. was born with a number of

---

Facts, ECF No. 51-1 ("Def.'s Stmt."); Pls.' Opp'n to Def.'s Mot. to Dismiss, or, in the Alternative, for Summ. J., ECF No. 52 ("Pls.' Opp'n"); Def.'s Opp'n to Pls.' Mot. for Partial Summary Judgment, ECF No. 53 ("Def.'s Opp'n"); Pls.' Reply Mem. in Response to Def.'s Opp'n to Pls.' Mot. for Partial Summ. J., ECF No. 54 ("Pls.' Reply"); Reply in Supp. of Def.'s Mot. for Summ. J., ECF No. 55 ("Def.'s Reply"). The Court has also reviewed all of the evidentiary materials attached to these documents.

[2] Although Defendant's [50] Motion was initially styled as both a motion to dismiss and a motion for summary judgment, Defendant has clarified that the motion is only for summary judgment. Def.'s Reply, at 1 n.1.

severe medical conditions, but was finally discharged on June 15, 2007. *Id.* ¶ 2. On September 8, 2007, Plaintiffs took L.C.H. to the NNMC emergency department, complaining of poor feeding. *Id.* ¶ 7. Later that evening, L.C.H. was transferred by helicopter to Walter Reed Army Medical Center ("Walter Reed"). *Id.* ¶ 8.

At Walter Reed, L.C.H. was initially observed on the regular pediatric floor, but in the early morning of September 9, 2007, he was transferred to the Pediatric Intensive Care Unit ("PICU") because of his worsening mental and respiratory status. *Id.* ¶ 10. Then, shortly after 8:00 A.M., L.C.H. was transferred by ambulance to Children's National Medical Center ("CNMC"). *Id.* ¶ 13. The reason for the transfer is disputed by the parties and is not relevant for purposes of the pending motions. During the evening of the same day, an exploratory laparotomy was performed on L.C.H., which identified a bowel obstruction, and part of L.C.H.'s bowel was removed. *Id.* ¶ 17; Def.'s Stmt. ¶ 10.

On September 10 and 11, 2007, L.C.H. suffered several seizures and was given Ativan. Def.'s Stmt. ¶¶ 12–13. Plaintiff Wilson observed one of these seizures, noting that it appeared as a "little shaking of [L.C.H.'s] arm . . . ." Def.'s Ex. C, at 74. Plaintiff Hagan was told about a seizure, but did not observe it himself. Def.'s Ex. G, at 112–13 ("[T]he doctor told me that [L.C.H.] had a seizure right there in front of me, and I was like, 'Where?' That's all I remember about the seizure conversation."). In addition, both Plaintiff Hagan and Plaintiff Wilson testified that they were told by medical professionals at CNMC, within a few days of L.C.H.'s admission to the hospital, that L.C.H. had suffered a stroke. Def.'s Ex. C, at 86; Ex. G, at 122. The exact timing of the stroke is disputed, but not the fact that it occurred. Def.'s Resp. to Pls.' Stmt., ECF No. 53-2, ¶ 19 (it is not "in dispute that L.C.H. suffered a stroke between September 8–10, 2007"; rather, the

government disputes that the stroke occurred during transport from Walter Reed to CNMC).

On September 11, 2007, a CT scan was performed on L.C.H. Def.'s Stmt. ¶ 17. The CT scan found "[e]dema throughout the bilateral frontal and teporoparietal lobes of unclear etiology," and "[s]uspect hypodensity in watershed areas of the centrum semiovale and posterior basal ganglia." Def.'s Ex. H. According to the testimony of Plaintiffs' expert, Dr. Michael Johnston, the finding of "edema" means that "there is increased water content of the brain, throughout the bilateral, frontal and temporal lobes." Def.'s Ex. E, at 45. The second finding, of "hypodensity," "refers to areas that may be lower density and could indicate some reduction in blood flow to those areas." *Id*. at 46. The reference to the "watershed" is "something that is . . . caused by reduction in blood pressure." *Id*.

On September 12, 2007, Plaintiffs were briefed by Dr. Catherine Corriveau, the PICU attending at CNMC, and other unidentified individuals from the Neurology Service and Social Work. Def.'s Stmt. ¶ 20. The briefing occurred after Plaintiff Hagan attempted to copy L.C.H.'s bedside charts and records and expressed "the desire to review some of [L.C.H.]'s clinical course over the past 24 [hours]." *Id*. ¶ 19 (citing Ex. J, CNMC 1895). Dr. Corriveau does not have an independent recollection of what she told Plaintiffs on September 12, but a contemporaneous note written by her states that the "[p]arents understand the severity of [L.C.H.'s] neurologic and intestinal injuries." Def.'s Ex. J; Ex. Q, at 31–34. According to Dr. Corriveau, "this note and how [she] wrote it would reflect that we gave [Plaintiffs] very grim news about both [L.C.H.'s] neurologic status and the prognosis for recovery . . . ." Def.'s Ex. Q, at 34. Plaintiff Hagan recalls that on September 12, he and Plaintiff Wilson "met with several doctors and other health care providers," who

told them that their "son was very sick, and that it was too soon to predict the outcome and that 'only time will tell.'" Pls.' Ex. 12, Hagan Decl. ¶ 9.

On September 17, 2007, an MRI was performed on L.C.H.'s brain. Def.'s Stmt. ¶ 23. The MRI showed "[d]iffuse cerebral edema/infarction." Def.'s Ex. M, CNMC 2155. "Infarction means stroke." Def.'s Ex. E, at 48. A note by the Social Work department, dated September 20, 2007, states that the "[p]arents have met [with] neurology to discuss MRI results." Def.'s Ex. K, CNMC 1974. According to Plaintiff Hagan, he and Plaintiff Wilson were "told that a brain CT and brain MRI showed abnormalities but that it was too soon to tell whether these abnormalities would have any long-term effects on [their] son's development." Pls.' Ex. 16, Hagan Decl. ¶ 11.

L.C.H. was discharged from CNMC on November 1, 2007. The discharge summary states the following:

> NEURO: [L.C.H. was] noted to have B/L cerebral infarct and secondary diffuse cerebral edema. Confirmed by CT scan. [Patient] noted to have seizure activity and was started on fosphenytoin and phenobarbital. [Seizure] activity stabilized and phenobarbital wean initiated. Final dose of phenobarb[ital] on 7/28. Neurology following. PM&R consulted as [patient] at risk for neuromotor dysfunction and recommended follow up in neuro and PM&R clinic. PT/OT consulted and [recommend] PT 3-5 days per week.

Def.'s Ex. N, CNMC 1847; Def.'s Stmt. ¶ 24. Plaintiff Wilson testified that she remembered receiving the discharge paperwork. Def.'s Ex. C, Wilson Depo., at 88–90. Shortly after the discharge, on November 21, Dr. Clarivet Torres wrote a letter to Dr. Anthony Sandler after seeing L.C.H. at the Intestinal Care Clinic at CNMC. Dr. Torres noted that L.C.H. "had a rough postoperative stay with a prolonged ventilation for about a week, and some brain hemorrhage, *but overcame all of these problems*." Pls.' Ex. 24 (emphasis added).

5

On December 13, 2007, L.C.H. was seen for a primary care visit at NNMC. Pls.' Stmt. ¶ 30. Under an entry entitled "Stroke Syndrome," Dr. Tiffany Ohta wrote that L.C.H. had a history

> of apparent stroke while hospitalized [from August to September 2007]. On exam, there does not appear to be neurological sequelae. Has neurology referral in computer, need to schedule [follow-up] at [Walter Reed]. Father to obtain copies of MRI from CNMC on disk to bring to [appointment].

Pls.' Ex. 25, NNMC 1383. Dr. Ohta also noted that L.C.H.'s "[m]ental status was normal." *Id*. Dr. Chad Mao agreed with this assessment. *Id*. Dr. Ohta and Dr. Mao made almost identical findings on January 31, 2008, noting again that L.C.H.'s "[m]ental status was normal," and that there was "currently . . . no apparent neurologic sequelae from stroke suffered during initial admission to CNMC [in August/September 2007]." Pls.' Ex. 26, NNMC 1388. Then again, on February 21, 2008, Dr. Ohta and Dr. Mao found that L.C.H.'s "[m]ental status was normal" and that his apparent stroke at CNMC was "without significant neurologic sequelae." Pls.' Ex. 28, NNMC 1397–98. They further noted that L.C.H. had an appointment "with [pediatric neurology] on [February 25, 2008]" and that L.C.H. would "[l]ikely require [a] repeat MRI at some point." *Id*. Dr. Ohta noted on April 10, 2008 that L.C.H. attended the neurology appointment, and that it was a "normal exam" and that there was "no urgent need for [a] repeat MRI." Pls.' Ex. 29, NNMC 1406. In the same note, Dr. Ohta again found, and Dr. Mao again agreed, that L.C.H. had a normal mental status, and that although L.C.H. "[s]uffered [a] stroke during . . . admission [to CNMC], [he] appear[ed] to have no long term neuro[logic] sequelae." *Id*. On June 5, Dr. Ohta again observed that L.C.H. had a normal mental status. Pls.' Ex. 30, NNMC 1411.

On July 25, 2008, L.C.H. was seen by developmental pediatrician Arne Anderson. Pls.' Stmt. ¶ 43. The purpose of the visit was to conduct a "neurodevelopmental assessment

6

for [a] patient at risk for developmental delay." Pls.' Ex. 31, NNMC 1414. Dr. Anderson noted that there was a "concern for hypoxemiac event and stroke," and that L.C.H.'s "[c]ognitive functioning was abnormal . . . ." *Id*. She also noted that "[o]verall [L.C.H.] has made wonderful progress in the last few months [considering] how sick he has been during the last few months. He will benefit from some intensive intervention to address concerns regarding his asymmetry and vision. [O]verall his development is 7–8 months with scatter to 9 months." *Id*.

During a September 3, 2008 evaluation at CNMC, Dr. Torres found that L.C.H.'s neurological exam was "grossly normal." Pls.' Ex. 32. The same finding was made by Dr. Torres during examinations on October 8, October 29, November 19, and December 10, 2008. Pls.' Exs. 34, 36–38.

On January 28, 2009, L.C.H. was again seen by Dr. Anderson. Pls.' Stmt. ¶ 52. During this examination, Dr. Anderson referred L.C.H. to the "[Pervasive] Developmental Disorder Clinic for further evaluation and opinion regarding the possibility of an Autism diagnosis." Pls.' Ex. 39, NNMC 1470. Subsequently, on February 20, 2009, a repeat MRI was conducted at Walter Reed. Pls.' Ex. 40. The examination report associated with the MRI states the following under a section entitled "Reason for Order":

> 21 month ex-25 week preemie (corrected age 18 months) with [history of] hypotensive ischemic brain injury at 5 months with imaging at that time showing edema of frontal, posterior temporal, occipital, parietal lobes and corpus callosum and thalami. Current status – autistic features with social and language delay but preserved gross and fine motor skill, vision and hearing.

Pls.' Ex. 40. Under "impression," the examination report states that there are "[e]xtensive areas of gliosis and encephalomalacia . . . ." *Id*.

On March 2, 2009, L.C.H. was seen and evaluated at Walter Reed by Dr. Jason N. Harris and Dr. Marleigh Erickson. Pls.' Stmt. ¶ 54. At that time, L.C.H. was first diagnosed with the condition of hypoxic ischemic encephalopathy. *Id.*; *see* Def.'s Resp. to Pls.' Stmt., at 8 (no dispute as to this being the first such diagnosis). The note associated with the March 2 evaluation states the following:

> HYPOXIC-ISCHEMIC ENCEPHALOPATHY: No e/o seizures per history. Pt still w/ decreased social interactions, but pt to see developmental peds. Pt's motor skills are surprisingly well developed considering what one might expect looking at MRI. No new lesions on MRI and imaging stable. At this time, pt should continue to be followed by pediatrics, Gen Peds and GI peds. No need for further neurologic follow up unless pt develops new concerning symptoms such as spasticity or e/o seizures. Could consider MRI at 4 years old to assess development of brain, but this is not mandatory.

Pls.' Ex. 41, NNMC 1499-6.

Plaintiff Hagan filed an administrative complaint on behalf of L.C.H. with the United States Department of the Navy on July 23, 2010, seeking compensation for the medical malpractice claims that underlie this action. Pls.' Stmt. ¶ 61 (citing Ex. 47).

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of *some* factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that

8

there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in its favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

With limited exceptions not relevant here, jury trials are not permitted under the FTCA, meaning the Court will serve the role of factfinder in this case, in lieu of the jury. 28 U.S.C. § 2402.

### III. DISCUSSION

The FTCA "waives the United States's sovereign immunity from tort claims and, subject to exceptions, renders the United States liable in tort as if it were a private person." *Gross v. United States*, 771 F.3d 10, 12 (D.C. Cir. 2014), *cert. denied,* 135 S. Ct. 1746 (2015). The Act further "provides that a tort claim against the United States 'shall be forever barred' unless it is presented to the 'appropriate Federal agency within two years after such claim accrues' and then brought to federal court 'within six months' after the agency acts on the claim." *Kwai Fun Wong*, 135 S. Ct. at 1629 (quoting 28 U.S.C. § 2401(b)). In *Kwai Fun Wong*, the Supreme Court clarified that these deadlines were not jurisdictional. *Id.* Instead, as the Supreme Court explained, "[t]he time limits in the FTCA are just time limits, nothing more." *Id.* at 1633. An administrative claim was lodged on behalf of L.C.H. on July 23, 2010, *see supra* at 8, meaning Plaintiffs' claim can proceed if it accrued on or after July 23, 2008.

The running of the FTCA's statute of limitations is determined by a standard set forth by the Supreme Court in *United States v. Kubrick*, 444 U.S. 111 (1979). Under the *Kubrick* standard, a claim accrues under the FTCA "by the time a plaintiff has discovered both his injury and its cause, even though he is unaware that the harm was negligently

inflicted." *Sexton v. United States*, 832 F.2d 629, 633 (D.C. Cir. 1987) (internal quotation marks omitted; citing *Kubrick*, 444 U.S. at 120, 123). The Supreme Court, in "justifying its approach . . . noted that Kubrick himself, 'armed with the facts about the harm done to him,' could 'protect himself by seeking advice in the medical and legal community' to determine whether there had been negligence." *Sexton*, 832 F.2d at 633 (internal quotation marks omitted). Consequently, the Supreme Court drew "a distinction between the facts about what happened to the plaintiff, on the one hand, and the facts and standards by which those events were to be evaluated, on the other." *Id.*

Under *Kubrick*, the plaintiff has a duty to inquire; that is, the ultimate question is whether the plaintiff knew, or with reasonable diligence should have known of, both the injury and its cause. *In re Swine Flu Immunization Prod. Liab. Litig.*, 880 F.2d 1439, 1443 (D.C. Cir. 1989) ("Because there is no evidence in the record to suggest that plaintiff did not conduct her inquiry in a reasonable manner, we hold that her submission is sufficient for a reasonable factfinder to conclude that she satisfied her duty to inquire."); *see also Landreth By & Through Ore v. United States*, 850 F.2d 532, 533 (9th Cir. 1988) ("In a medical malpractice case under the FTCA, a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its cause."). "The point in time at which the plaintiff knew or should have known of an injury is a question of fact . . . and the trial judge may make this determination as a matter of law only if no reasonable person could disagree on the date . . . ." *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 463 n.11 (D.C. Cir. 1989).

The record presently before the Court is not sufficiently clear for either party to be entitled to summary judgment on Defendant's statute of limitations defense. In this case,

the ultimate question is *when* Plaintiffs knew or should have known that L.C.H. suffered a brain injury. Defendant's position is encapsulated in the following passage from its motion for summary judgment:

> Certainly in September 2007, Plaintiffs knew that L.C.H. suffered a brain injury. Even if they personally did not recognize the stroke as an injury, it is of no moment. A reasonable person armed with the information that L.C.H. was having seizures requiring medication; that because of the seizures, multiple imaging studies were performed; that those imaging studies showed that L.C.H. had suffered a stroke; discussed the severity of the findings with L.C.H.'s doctor and neurology; and received documentation stating that because of the stroke L.C.H. was at risk for neuromotor dysfunction; would have the requisite knowledge that L.C.H. suffered a brain injury.

Def.'s Mem. at 12. The record is not so clear, and there is a mass of factual information supporting both Plaintiff's and Defendant's view of when it was reasonable for Plaintiffs to have known of the brain injury.

At the very outset, the record evidence is equivocal on whether a stroke or a seizure are themselves "injuries," rather than the causes or symptoms of an underlying neurological disorder, and whether a stroke occurred at all. *See* Pls.' Ex. 25, Wiznitzer Depo., at 31 ("The seizures are a consequence of the brain injury."); at 37 ("By definition, a stroke is . . . damage to brain tissue within a vascular territory due to either an occlusion of the blood vessel or to hemorrhage in that area, and his injury, therefore, was not technically a stroke."); Pls.' Ex. 48, Silver Rule 26 Disclosure, at 5 (referring to seizures and strokes as "neurologic events"); *see also Hagan*, 2012 WL 6570685, at *2 ("What is critical here are the neurologic consequences from these events, and when Hagan learned of them."). Furthermore, while several progress notes refer to "stroke syndrome," prior to July 25, 2008, these all suggest an absence of any neurological consequences from the stroke. *See supra* at 6. Consequently, while there is no dispute that both Plaintiffs were aware by

September 12, 2007 that L.C.H. had suffered a stroke and several seizures, the pertinent question is whether they were then aware, or reasonably should have been aware, that L.C.H. had a brain injury.

For their part, Plaintiff Hagan testified that he was not informed of the consequences of a stroke in September 2007, and Plaintiff Wilson does not recall what she was told at that time. Pls.' Ex. 14A, Hagan Depo., at 123; Def.'s Ex. C, Wilson Depo., at 87. Nonetheless, in one sense, the very occurrence of the stroke and seizures may be sufficient for a factfinder to conclude that Plaintiffs knew or should have known that L.C.H. had a brain injury. At very least, it may have been a sufficient impetus for Plaintiffs to inquire into whether L.C.H. had a brain injury. Also on this side of the scale is Dr. Corriveau's notation on September 12, 2007 that Plaintiffs understood "the severity of [L.C.H.'s] neurologic and intestinal injuries." *Supra* at 4. In addition, it is uncontested that the September 11, 2007 CT scan showed evidence of edema and hypodensity, and that a September 17, 2007 MRI showed evidence of edema and stroke. *Id.* Then, on November 1, 2007, L.C.H. was discharged, and his discharge paperwork noted that he was "at risk of neuromotor dysfunction." *Supra* at 5.

All of these facts support the government's position, but none are so clear as the government would have them. First, as already noted, the connection between a stroke or seizure on the one hand, and "brain injury" on the other, is contested. Second, while Dr. Corriveau noted contemporaneously that Plaintiffs understood the severity of L.C.H.'s "neurologic and intestinal injuries," she has no independent recollection of the conversation. *Supra* at 4. Consequently, there is no contemporaneous record evidence of what was discussed. Plaintiffs, for their part, have represented that they were told on the

13

same day by medical professionals that "only time will tell" what would happen to their son. *Supra* at 5. A determination of what was actually said that day will inevitably require a credibility determination between the testimony of Dr. Corriveau and Plaintiffs. However, such a determination is inappropriate for the Court to make on a motion for summary judgment. *United States v. $17,900 in United States Currency*, 859 F.3d 1085, 1091 (D.C. Cir. 2017) (on a motion for summary judgment, "the court may not make credibility determinations or otherwise weigh the evidence" (internal quotation marks omitted)). Also, while the November 1 discharge note says that Plaintiff was "at risk of neuromotor dysfunction," what to make of the "at risk" qualifier requires a weighing of the evidence and surrounding testimony. *Id*. It may mean that L.C.H. had a brain injury and was therefore likely to have a neuromotor dysfunction. However, it may also mean that L.C.H. suffered a stroke and several seizures, and that these *could* eventually cause some neuromotor dysfunction. Determining which of these interpretations is more likely requires a weighing of the evidence, which is likewise inappropriate for summary judgment.

Admittedly, the facts relied upon by the government, in isolation, perhaps suggest that Plaintiffs were on notice and reasonably should have discovered L.C.H.'s brain injury in September 2007. But that is only one side of the equation. Plaintiffs have proffered substantial factual evidence that treating physicians on numerous occasions concluded that L.C.H.'s neurological condition was within the bounds of normalcy. For instance, on November 21, 2007, shortly after L.C.H. was discharged from CNMC, Dr. Torres noted that L.C.H. "had a rough postoperative stay . . . and some brain hemorrhage, *but overcame all of these problems*." *Supra* at 5. On December 13, 2007, Dr. Ohta, with agreement from Dr. Mao, noted that upon examination, L.C.H. did "not appear to have neurological

14

sequelae," and that his mental status was normal. *Supra* at 6. They made nearly identical determinations in January, February, April, and June 2008. *Id*. The April 2008 evaluation, in particular, concluded that although L.C.H. suffered a stroke, he "appear[ed] to have no long term neuro[logic] sequelae." *Id*. Similarly, Dr. Torres determined in September, October, November, and December 2008 that L.C.H.'s neurological exam was "grossly normal." *Supra* at 7.

Expert testimony supports Plaintiffs' contention that L.C.H.'s brain injury was "masked by normalcy" until at least July 25, 2008. Pls.' Stmt. ¶ 55. The Rule 26(a)(2)(B) disclosure statement of the defense expert Dr. Silver states that L.C.H.'s

> *development was found to be normal by multiple providers over a 16 month period of time after admission*. Acute stroke and brain injury symptoms would most likely appear immediately. The late findings of developmental delay and autism are most likely caused by his extreme prematurity and extreme low birth weight.

Pls.' Ex. 48 (emphasis added). The disclosure also states that "[f]ollow up with pediatric Neurology, primary care physicians and physical therapists from discharge until early 2009, over one year and 4 months after volvulus repair note normal development, head circumference, muscle tone, strength and posture, and mental status. Multiple references to the finding of 'no neurologic sequalae' were made." *Id*. During her testimony, Dr. Silver agreed that, as of September 11, 2007, "*the extent and severity of any adverse neurological condition was yet unknown*[.]" Pls.' Ex. 47, at 27 (emphasis added).

Plaintiffs' experts offered similar conclusions. Dr. Max Wiznitzer opined that "[r]eaching a diagnosis of neurological dysfunction and permanent brain injury in a premature child with reportedly normal neurological development, such as L.C.H., is a process that can take a period of time that can be greater than 1 year." Pls.' Ex. 50, at 6.

15

Dr. Wiznitzer also testified that given L.C.H.'s prematurity, it would have only been "in very late 2008 or early 2009, [that] people would have started recognizing that there[ was] something different about [L.C.H.]" Pls.' Ex. 19, at 62. Another of Plaintiffs' experts, Dr. Michael Johnston, opined that:

> L.C.H.'s mental and cognitive functions were masked by normalcy until at least July 25, 2008, up to which time L.C.H.'s attending pediatricians concluded reasonably that he had a full recovery from his stroke . . . . After this type of brain injury in an older child, it is common to have motoric deficits, paralysis and spasticity. However in a 5 month old baby born prematurely, these clinical signs are often not apparent. L.C.H. had none of these common findings, and the measureable expression of his mental and cognitive functions was limited to early infancy abilities which therefore did not disclose his underlying serious brain injuries and stroke-related disabilities.

Pls.' Ex. 42. This is not to say that Plaintiffs' side of the equation is so laden with favorable factual matter that summary judgment is warranted in their favor. There is the pro-government evidence already described above, which to some degree suggests that Plaintiffs were told of "neurological injuries" in September 2007. Furthermore, while the diagnosis of hypoxic ischemic encephalopathy was initially made in March 2009, the note associated with that diagnosis states that "[n]o new lesions" were apparent on the repeat MRI, and that "imaging [was] stable." *Supra* at 8 (citing Pls.' Ex. 41). This suggests that the neurological injury was present all along. Consequently, there is substantial factual matter on both sides of equation, and summary judgment is not the appropriate mechanism by which to decide which party the evidence ultimately favors on the question of when Plaintiffs were or should have been aware of the brain injury for which relief is sought.

Courts faced with similar factual circumstances have held to the same effect. In *Swine Flu*, the D.C. Circuit held that dismissal on the basis of the FTCA's statute of limitations was not appropriate as a matter of law because the record indicated that "the

16

relatively mild symptoms experienced by plaintiff shortly after inoculation—vomiting and body aches—went away, and that the more serious but sporadic and varied symptoms that plagued her (and befuddled her doctors) in the years that followed were of quite a different nature." *Swine Flu*, 880 F.2d at 1443. In *Winter*, the United States Court of Appeals for the Ninth Circuit noted that "it has held that a cause of action does not accrue under the FTCA when a plaintiff has relied on statements of medical professionals with respect to his or her injuries and their probable causes." *Winter v. United States*, 244 F.3d 1088, 1090 (9th Cir. 2001). One example was *Raddatz v. United States*, in which an Army doctor perforated the plaintiff's uterus while attempting to insert an IUD, and the plaintiff subsequently complained of "severe pain, discomfort, and cramps." 750 F.2d 791, 793 (9th Cir. 1984). During subsequent consultations with Navy physicians, the plaintiff was told that her symptoms were normal side effects. *Id*. The Ninth Circuit reversed summary judgment against the plaintiff with respect to the Navy, observing that when the plaintiff "tried to find out why her condition was getting worse, the Navy doctor repeatedly assured her that her condition was a normal consequence of the perforated uterus." *Id*. at 796. The court held that "[s]uch assurances may be reasonably relied on by a patient," and that the plaintiff's claim accrued with respect to the Navy only when she was finally told by "her private physician . . . that her perforated uterus had developed an infection." *Id*.

The government heavily relies on *T.L. ex rel. Ingram v. United States*, 443 F.3d 956 (8th Cir. 2006), which was cited favorably by Judge Robert L. Wilkins in dismissing this case for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Hagan*, 2012 WL 6570685, at *6. Given the more fully developed factual record, *Ingram* is now readily distinguishable from this case. There, the plaintiff was

informed shortly after delivery that her child had a "severe, permanent brain injury and a poor prognosis." *Ingram*, 443 F.3d at 962 (internal quotation marks and alteration omitted). On that basis, the United States Court of Appeals for the Eighth Circuit held that the plaintiff was on notice of her child's brain injury, even if a diagnosis of cerebral palsy, for which she sued, came substantially later. *Id*. According to the court, "Ingram had a duty under the law to seek advice about possible legal action at the time she knew of T.L.'s brain injury, not only after the full effects of the brain damage were manifested." *Id*. at 962–63.

Here, however, the question is whether Plaintiffs were aware, or should have been aware, that L.C.H. had *any* brain injury—it is not one of extent. The record evidence is that Plaintiffs were informed that their son had suffered a stroke and several seizures in September 2007. Whether a stroke and seizures are themselves brain injuries are disputed factual issues. Furthermore, around the same time, there is some suggestion that the parents were informed of a neurological injury, but the parents' testimony is that the diagnosis was far more equivocal. They themselves testified that they were unaware of or do not recall being told the neurological consequences of a stroke. Then, following L.C.H.'s discharge in November 2007, treating physicians repeatedly concluded that his neurological condition was within the bounds of normalcy. Given the factual circumstances of this case, the Court cannot presently conclude whether or not Plaintiffs were or should have been aware that L.C.H. had a brain injury. To hold for the government here would be to disregard the substantial evidence that L.C.H.'s treating physicians themselves failed to diagnose L.C.H. with a brain injury until long after September 2007. It would also make for bad policy, requiring patients to sue even when competent medical advisors tell them that there is no injury. *See E.Y. ex rel. Wallace v. United States*, 758 F.3d 861, 867 (7th Cir. 2014)

("In applying the FTCA statute of limitations to claims of medical malpractice, we have long avoided requiring would-be plaintiffs to engage in paranoid investigations of everyone who has ever provided them with medical care."). More practically, a factfinder might very well determine that a reasonable person, when told by physicians that their son did not have a neurological disorder, would conclude that a stroke and several seizures did not result in a brain injury. On the other hand, the factfinder might conclude that the stroke and seizures were sufficient to put the parents on notice. Deciding between these two conclusions in this case will inevitably require a weighing of the evidence, and the making of credibility determinations between competing witness testimony. Accordingly, summary judgment on the statute of limitations issue is not appropriate.[3]

## IV. CONCLUSION AND ORDER

For the foregoing reasons, Plaintiffs' [50] Motion for Partial Summary Judgment is **DENIED**, and Defendant's [51] Motion for Summary Judgment is **DENIED**.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[3] Plaintiff Wilson contends that the statute of limitations issue does not apply to her claims because the statute was tolled for her by the Servicemembers Civil Relief Act, 50 U.S.C. App. § 526(a). Defendant does not contest this legal assertion. However, Plaintiff Wilson has not pointed to any record evidence that she was "on active duty with the United States Air Force between August 15, 2007 and September 1, 2012 . . . ." Pls.' Reply at 2. Accordingly, summary judgment in favor of Plaintiff Wilson is not appropriate on this issue, and summary judgment against her is inappropriate for the independent reasons detailed above.